**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

| | |
|---|---|
| JAMES E. SHELTON, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>POST UNIVERSITY, INC.,<br><br>Defendant. | Case No.<br><br><br><br>November 1, 2018 |

## CLASS ACTION COMPLAINT

### Preliminary Statement

1. Plaintiff James Shelton brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 372 (2012).

2. In violation of the TCPA, Post University, Inc. used a vendor to send automated calls to cellular telephone numbers, including that of Plaintiff.

3. Then, despite telling Defendant he did not want to receive any more automated contacts from them, he was sent an automated text message robocall.

4. Plaintiff had not consented to receive robocalls from Defendant.

5. The purpose of these calls was to sell Defendant's for-profit educational services.

6. Because telemarketing campaigns generally place calls to hundreds of thousands or even millions of potential customers *en masse*, and because Plaintiff's investigation has revealed facts—as set forth below—indicating that he was the target of one such massive

campaign, Plaintiff brings this action on behalf of a proposed nationwide class of other persons who received illegal telemarketing calls from or on behalf of Defendant.

7. Consistent with the fairness and efficiency goals of Federal Rule of Civil Procedure 23, a class action is the best means of obtaining redress for Post's wide-scale illegal telemarketing.

**Parties**

8. Plaintiff is a natural person currently residing in Ohio with a permanent residence in Pennsylvania.

9. He is, and at all times relevant to this complaint was, a "person" as defined by 47 U.S.C. § 153(39).

10. Defendant is a corporation incorporated under the laws of the State of Delaware.

11. It is, and at all times relevant to this complaint was, a "person," as defined by 47 U.S.C. § 153(39).

12. Its principal place of business is 800 Country Club Road, Waterbury, Connecticut 06708.

13. Its registered agent for service of process is Corporation Service Company, 50 Weston Street, Hartford, Connecticut 06120.

**Jurisdiction and Venue**

14. This Court has federal-question subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331 because the TCPA is a federal statute. 47 U.S.C. § 227; *Mims*, 565 U.S. at 372.

15. This Court has personal jurisdiction over Defendant because it is headquartered in this District and the calls challenged in this case were made or commissioned from its headquarters.

16. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) because Defendant is headquartered in Connecticut. Moreover, venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because the calls challenged in this case were made or commissioned from its headquarters.

**History of the TCPA**

17. Enacted in 1991, the TCPA makes it unlawful "to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using an automatic telephone dialing system or an artificial or prerecorded voice … to any telephone number assigned to a … cellular telephone service." 47 U.S.C. § 227(b)(1).

18. Calls made by an automated telephone dialing system ("ATDS") or with a prerecorded or artificial voice are referred to as "robocalls" by the FCC. Encouraging individuals to hold robocallers accountable on behalf on their fellow Americans, the TCPA provides a private cause of action to persons who receive such calls. 47 U.S.C. § 227(b)(3).

19. In enacting the TCPA, Congress found: "Evidence compiled by the Congress indicates that residential telephone subscribers consider automated or prerecorded telephone calls, regardless of the content or the initiator of the message, to be a nuisance and an invasion of privacy." Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, 105 Stat. 2394 § 2(10). Congress continued: "Banning such automated or prerecorded telephone calls to the home, except when the receiving party consents to receiving the call or when such calls are necessary in

an emergency situation affecting the health and safety of the consumer, is the only effective means of protecting telephone consumers from this nuisance and privacy invasion." *Id.* § 2(12).

20. The TCPA's sponsor described unwanted robocalls as "the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone out of the wall." 137 Cong. Rec. 30,821 (1991) (statement of Sen. Hollings).

21. For TCPA purposes, a text message is a call.

22. The Federal Communications Commission ("FCC") has made clear that "prior express written consent" is required before making telemarketing robocalls to wireless numbers. Specifically, it ordered:

> [A] consumer's written consent to receive telemarketing robocalls must be signed and be sufficient to show that the consumer: (1) received clear and conspicuous disclosure of the consequences of providing the requested consent, i.e., that the consumer will receive future calls that deliver prerecorded messages by or on behalf of a specific seller; and (2) having received this information, agrees unambiguously to receive such calls at a telephone number the consumer designates. In addition, the written agreement must be obtained without requiring, directly or indirectly, that the agreement be executed as a condition of purchasing any good or service.

*In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 27 FCC Rcd. 1830, 1844 ¶ 33 (2012) (footnotes omitted) (internal quotation marks omitted) ("2012 FCC Order").

23. As with most torts, the consent required to be shown by the defendant is that of the alleged victim, not a random third party.

24. The consumer's signature on the document memorializing prior express written consent need not be in ink. An electronic signature suffices, if it complies with the E-SIGN Act, 15 U.S.C. §§ 7001, *et seq.* 2012 FCC Order at ¶¶ 33-34.

**The Worsening Problem of Robocalls and Spam Texts**

25. Unfortunately, the problems Congress identified when it enacted the TCPA have grown only worse in recent years.

26. "Month after month, unwanted [communications], both telemarketing and informational, top the list of consumer complaints received by the [Federal Communications] Commission." *In re Rules and Regulations Implementing the TCPA of 1991*, 30 FCC Rcd. 7961, 7991 ¶ 1 (2015).

27. "Robocalls and telemarketing calls are currently the number one source of consumer complaints at the FCC." Tom Wheeler, *Cutting off Robocalls* (July 22, 2016), https://www.fcc.gov/news-events/blog/2016/07/22/cutting-robocalls (statement of FCC Chairman).

28. "The FTC receives more complaints about unwanted calls than all other complaints combined." Comment of the Staff of the Federal Trade Commission's Bureau of Consumer Protection, *In re Rules and Regulations Implementing the TCPA of 1991, Notice of Proposed Rulemaking*, CG Docket No. 02-278, at p. 2; FCC 16-57 (June 6, 2016), *available at* https://www.ftc.gov/system/files/documents/advocacy_documents/comment-staff-ftc-bureau-consumer-protection-federal-communications-commission-rules-regulations/160616robocallscomment.pdf.

29. In 2017, the FTC received 4,501,967 complaints about robocalls, compared with 3,401,614 in 2016. Federal Trade Commission, *FTC Releases FY 2017 National Do Not Call*

*Registry Data Book and DNC Mini Site* (Dec. 18, 2017), https://www.ftc.gov/news-events/press-releases/2017/12/ftc-releases-fy-2017-national-do-not-call-registry-data-book-dnc.

30. The *New York Times* and *Wall Street Journal* and other leading news outlets have recently reported extensively on the surging number of robocall complaints filed by consumers with the FTC and widespread consumer outrage about illegal telemarketing. *E.g.*, Tara Siegel Bernard, *Yes, It's Bad. Robocalls, and Their Scams, Are Surging*, N.Y. Times (May 6, 2018), https://www.nytimes.com/2018/05/06/your-money/robocalls-rise-illegal.html.

31. Last month, a technology provider combatting robocalls warned that nearly *half* of all calls to cell phones next year will be fraudulent. First Orion, *Nearly 50% of U.S. Mobile Traffic Will Be Scam Calls by 2019* (Sept. 12, 2018), https://www.prnewswire.com/news-releases/nearly-50-of-us-mobile-traffic-will-be-scam-calls-by-2019-300711028.html. At least one of the scammer's techniques that the provider warns of—"neighborhood spoofing"—was utilized by Defendant, as set forth in further detail below.

**Factual Allegations**

32. Post is a for-profit university.

33. Its acceptance rate is 81%.

34. Its enrollment is 7,317.

35. Its graduation rate is 27%.

36. It replaces churned customers by obtaining new ones via telemarketing.

37. This involves two steps. First, Post commissions the affiliate to place an automated or prerecorded telemarketing call pitching "going back to school." Second, if the target of the call doesn't immediately hang up, the affiliate "qualifies" him or her as a warm lead for Post's employees to telemarket to directly.

38. That was Plaintiff's experience.

39. Plaintiff's cell phone number is (484) XXX-3942. All calls and text messages to Plaintiff described herein were to that number.

40. It has been assigned to him since 2014.

41. He is its owner and sole user.

42. At all times relevant to this complaint, that number has been listed on the National Do Not Call Registry for at least 31 days.

43. As of June 12, 2018, he had never given his phone number to or done business with Post.

44. On June 13, his phone rang.

45. The caller ID showed (484) 146-1094.

46. On information and belief, the area code on the caller ID was spoofed or selected by contrivance in order to convey to Plaintiff the false impression that the caller was from his area.

47. He answered.

48. There was an electronic sound characteristic of automatic dialers and a pause, another telltale sign of the use of an ATDS.

49. A prerecorded or artificial voice played.

50. It pitched higher education and asked if he was interested in "going back to school."

51. Plaintiff heard several more statements by prerecorded or artificial voices.

52. Then, a live male came on the line.

53. The male pitched Plaintiff on Post.

54. The male repeatedly requested, and in every instance Plaintiff refused to provide, consent to being contacted by ATDS or text message. Plaintiff never provided prior express written consent to Defendant to direct any automated telemarketing to him or his cell phone.

55. After the call ended, Plaintiff called back the number that had showed on caller ID: (484) 146-1094.

56. The call immediately disconnected as a non-working number, further suggesting that the caller ID was spoofed.

57. On June 14, Plaintiff emailed Post officials requesting a copy of Post's internal do-not-call policy and asking to be put on its internal do-not-call list.

58. He never received any such do-not-call policy.

59. He did, however, receive more automated telemarketing from Post. On June 18, he received a text message.

60. The caller ID read 338-98.

61. The message read: "Hello, this is Post University. Classes begin June 25th! Contact your Enrollment Team @ 203-568-1652 for more information. Msg&DataRatesMayApply TextSTOPtoEnd" [sic].

62. For their prerecorded robocalls and automated texts, Post and its affiliates use ATDSs with the capacity to store or produce telephone numbers to be called. These ATDSs include predictive dialers and dialers that play one or more prerecorded messages once the calls connect.

63. Recipients of these calls, including Plaintiff, did not consent to receive them.

64. The calls were not necessitated by an emergency.

65. Defendant's purported consents to make the calls at issue were not provided by Plaintiff or class members.

66. Defendant's purported consents to make the calls at issue lack wet-ink signatures.

67. Defendant's purported consents to make the calls at issue lack signatures compliant with the E-SIGN Act.

68. The telemarketing alleged herein:

a. invaded Plaintiff's privacy and solitude;

b. interrupted Plaintiff's train of thought;

c. wasted Plaintiff's time;

d. annoyed Plaintiff;

e. harassed Plaintiff; and

f. consumed the battery life of Plaintiff's cellular telephone.

**Post's Liability for the Prerecorded Call**

69. While Post is directly liable for the telemarketing text message it sent Mr. Shelton after he asked to be placed on their Internal Do Not Call List and not receive any more calls, it is also vicariously liable for the original pre-recorded telemarketing call that generated the lead for Post.

70. The FCC is tasked with promulgating rules and orders related to enforcement of the TCPA. 47 U.S.C. 227(b)(2).

71. The FCC has explained that its "rules generally establish that the party on whose behalf a solicitation is made bears ultimate responsibility for any violations." *In re Rules & Regulations Implementing the Telephone Consumer Protection Act of 1991*, 10 FCC Rcd. 12391, 12397 ¶ 13 (1995).

72. The FCC reiterated that a company on whose behalf a telephone call is made bears the responsibility for any violations. *In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 23 FCC Rcd. 559, 565 ¶ 10 (2008) (recognizing "on behalf of" liability in the context of an autodialed or prerecorded message call sent to a consumer by a third party on another entity's behalf under 47 U.S.C. § 227(b)).

73. The FCC confirmed this principle in a declaratory ruling holding that sellers such as Post may not avoid liability by outsourcing telemarketing:

> [A]llowing the seller to avoid potential liability by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions. This would particularly be so if the telemarketers were judgment proof, unidentifiable, or located outside the United States, as is often the case. Even where third-party telemarketers are identifiable, solvent, and amenable to judgment limiting liability to the telemarketer that physically places the call would make enforcement in many cases substantially more expensive and less efficient, since consumers (or law enforcement agencies) would be required to sue each marketer separately in order to obtain effective relief. As the FTC noted, because sellers may have thousands of independent marketers, suing one or a few of them is unlikely to make a substantive difference for consumer privacy.

*In re DISH Network, LLC*, 28 FCC Rcd. 6574, 6588 ¶ 37 (2013) (footnote omitted) (alteration marks and internal quotation marks omitted).

74. More specifically, *Dish* held that, even in the absence of evidence of a formal contractual relationship between the seller and the telemarketer, a seller is liable for telemarketing calls if the telemarketer "has apparent (if not actual) authority" to make the calls. *Id.* at 6586 ¶ 34.

75. The ruling rejected a narrow view of TCPA liability, including the assertion that a seller's liability requires a finding of formal agency and immediate direction and control over the third-party who placed the telemarketing call. *Id.* at 6587 ¶ 36 & n.107.

76. To the contrary, the FCC—armed with extensive data about robocallers and Americans' complaints about them—determined that vicarious liability is essential to serve the TCPA's remedial purpose of protecting Americans from "unwanted telemarketing invasions." *Id.* at 6587 ¶ 36.

77. Vicarious liability is important because reputable, traceable, and solvent companies that benefit from illegal telemarketing are "in the best position to monitor and police TCPA compliance by third-party telemarketers." *Id.* at 6588 ¶ 37.

78. Post is legally responsible for ensuring that the affiliates that make telemarketing calls on its behalf comply with the TCPA when so doing.

79. Post knowingly and actively accepted business that originated through illegal telemarketing.

80. Post knew (or reasonably should have known) that its telemarketer was violating the TCPA on its behalf but failed to take effective steps within Post's power to force the telemarketer to cease that conduct.

81. By hiring a company to make calls on its behalf, Post "manifest[ed] assent to another person . . . that the agent shall act on the principal's behalf and subject to the principal's control" as described in the Restatement (Third) of Agency ("Restatement").

82. Moreover, Post maintained interim control over the actions of its telemarketers.

83. For example, Post had absolute control over whether, and under what circumstances, it would accept a customer from its telemarketers.

84. Furthermore, Post had day-to-day control over the actions of its telemarketers, including the ability to prohibit them from using an ATDS or prerecorded messages to contact potential customers of Post and the ability to require them to respect the National Do Not Call Registry.

85. Post also gave interim instructions to its telemarketers by providing lead-qualifying instructions and lead volume limits.

86. Post donned its telemarketers with apparent authority theory to make the calls at issue. Thus, the telemarketers not only pitched higher education in the abstract but also specifically pitched Post by name.

87. Apparent authority turns on whether a third party believes the principal authorized its agent to act and the belief is "traceable" to a manifestation of the principal. Restatement § 2.03 cmt. c.

88. "[A]pparent authority can arise in multiple ways, and does *not* require that 'a principal's manifestation must be directed to a specific third party in a communication made directly to that person.'" *Dish*, 28 FCC Rcd. at 6586 ¶ 34 n.102 (quoting Restatement § 2.03 cmt. c).

89. A principal may make a manifestation "by directing an agent to make statements to third parties or directing or designating an agent to perform acts or conduct negotiations, placing an agent in a position within an organization, or placing an agent in charge of a transaction or situation." Restatement § 2.03 cmt. c.

90. Post's telemarketer transferred customer information, including Plaintiff's contact information, directly to Post. Thus, the telemarketer had the "ability . . . to enter consumer

information into the seller's sales or customer systems," which the FCC has explained to show apparent agency. *Dish*, 28 FCC Rcd. at 6592 ¶ 46.

91. Finally, the FCC has held that called parties may obtain "evidence of these kinds of relationships . . . through discovery, if they are not independently privy to such information." *Id.* at 6592-93 ¶ 46. Evidence of circumstances pointing to apparent authority on behalf of the telemarketer "should be sufficient to place upon the seller the burden of demonstrating that a reasonable consumer would not sensibly assume that the telemarketer was acting as the seller's authorized agent." *Id.* at 6593 ¶ 46.

**Class Action Allegations**

92. Pursuant to Federal Rule of Civil Procedure 23(b)(2) and (b)(3), Plaintiff brings this action on behalf of a class defined as follows: All persons in the United States to whom:

a. Defendant and/or a third party acting on its behalf made a call or sent a text message

b. to a cellular telephone number

c. using an ATDS or an artificial or prerecorded voice

d. in order to market Defendant's products

e. in the absence of an emergency

f. during the period that begins four years before the filing of the original complaint in this matter and ends on the first day of trial.

93. Notwithstanding the immediately preceding paragraph, excluded from the class are Defendant, any entity in which Defendant have a controlling interest or that has a controlling interest in Defendant, Defendant's legal representatives, assignees, and successors, the judges to

whom this case is assigned and the employees and immediate family members of all of the foregoing.

94. Plaintiff is a member and proposed representative of the class.

95. The class is identifiable through calling records and phone number databases.

96. The class is so numerous that joinder of all its members is impracticable. Post telemarketed to Plaintiff even though he lives hundreds of miles from it, suggesting that it telemarkets to thousands of prospective customers. Sending a robotext or placing a robocall costs less than one cent, so Defendant could afford to do so at massive scale. On information and belief, the class has more than 1,000 members.

97. There are many questions of law and fact that have the same answer for Plaintiff as they do for the other members of the class. Indeed, the very feature that makes Defendant's conduct so annoying—its automated, cookie-cutter nature—makes the key questions in this dispute amenable to resolution in one stroke. These common questions of law and fact include, but are not limited to, the following:

a. What the relationships between Defendant and its telemarketers are;

b. Whether the text messages were sent *en masse* by ATDS (or, instead, individually composed and transmitted);

c. Whether the voice referenced above was artificial or prerecorded (or, instead, a live person who sounds robotic);

d. Whether Defendant's desire to sell for-profit educational services constitutes an "emergency" within the meaning of the TCPA;

e. Whether, under the TCPA, one may send automated telemarketing text messages without prior express written consent provided that the messages contain opt-out instructions;

f. Whether Defendant had a pattern and practice of telemarketing to numbers on the National Do Not Call Registry;

g. Whether Defendant knew its telemarketer was calling leads without their permission;

h. Whether Defendant profited from the illegal telemarketing;

i. Whether Defendant's violations were knowing or willful.

98. Plaintiff's claims are typical of those of the class. Plaintiff's claims and those of his fellow class members arise out of the same course of conduct by Defendant and are based on the same legal and remedial theories.

99. Plaintiff will fairly and adequately protect the interests of the class. Plaintiff has retained competent and capable counsel experienced in TCPA class action litigation. Plaintiff and his counsel are committed to prosecuting this action vigorously on behalf of the class and have the financial resources to do so. The interests of Plaintiff and his counsel are aligned with the interests of class members.

100. The common issues arising from this conduct that affect Plaintiff and members of the class predominate over any individual issues, making a class action the superior means of resolution. Adjudication of these common issues in a single action has important and desirable advantages, including judicial economy, efficiency for class members and classwide *res judicata* for Defendant. Classwide relief is essential to compel Defendant to comply with the TCPA.

a. Control: The interest of individual members of the class in individually controlling the prosecution of separate claims against Defendant is small because the damages in an individual action ($500 to $1,500 per violation) are dwarfed by the cost of prosecution.

b. Litigation: Plaintiff is not aware of any pending TCPA litigation between class members and Defendant.

c. Forum: The forum is a desirable, efficient location in which to resolve the dispute because Defendant is headquartered in it, so much if not most of the relevant evidence and witnesses are located within it.

d. Management: No significant difficulty is anticipated in the management of this case as a class action. Management of these claims is likely to present significantly fewer difficulties than are presented in many class actions because the calls at issue are automated (and thus uniform) and because the TCPA articulates bright-line standards for liability and damages.

101. Defendant has acted on grounds generally applicable to the class, thereby making final injunctive relief and corresponding declaratory relief with respect to the class appropriate on a classwide basis.

**Legal Claims**

**Count One:**
**Violations of the TCPA, 47 U.S.C. § 227(b)(1), by Automated Telemarketing Without Prior Express Written Consent**

102. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

103. Defendant and/or its affiliates or agents violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency telemarketing calls (including text messages) to the

cellular telephone numbers of Plaintiff and class members using an ATDS and/or artificial or prerecorded voice without prior express written consent.

104. Plaintiff and class members are entitled to an award of $500 in damages for each such violation. 47 U.S.C. § 227(b)(3)(B).

105. Plaintiff and class members are also entitled to and do seek an injunction prohibiting Defendant and its affiliates and agents from violating the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency telemarketing calls (including text messages) to any cellular telephone number using an ATDS and/or artificial or prerecorded voice without prior express written consent.

**Count Two:**

**Knowing and/or Willful Violations of the TCPA, 47 U.S.C. § 227(b)(1), by Automated Telemarketing Without Prior Express Written Consent**

106. Plaintiff realleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

107. Defendant and/or its affiliates or agents knowingly and/or willfully violated the TCPA, 47 U.S.C. § 227(b)(1), by placing non-emergency telemarketing calls (including text messages) to the cellular telephone numbers of Plaintiff and class members using an ATDS and/or artificial or prerecorded voice without prior express written consent.

108. Plaintiff and class members are entitled to an award of $1,500 in damages for each such knowing and/or willful violation. 47 U.S.C. § 227(b)(3) (hanging paragraph).

**Relief Sought**

For himself and all class members, Plaintiff requests the following relief::

A. Certification of the proposed class;

B. Appointment of Plaintiff as representative of the class;

C. Appointment of the undersigned counsel as counsel for the class;

D. A declaration that actions complained of herein violate the TCPA;

E. An order enjoining Defendant and its affiliates, agents and related entities from engaging in the unlawful conduct set forth herein;

F. An award to Plaintiff and the class of damages, as allowed by law;

G. An award to Plaintiff and the class of costs and attorneys' fees, as allowed by law or equity;

H. Leave to amend this Complaint to conform to the evidence presented at trial; and

I. Orders granting such other and further relief as the Court deems necessary, just, and proper.

Plaintiff requests a trial by jury for all issues so triable.

RESPECTFULLY SUBMITTED AND DATED this 1st day of November, 2018.

By: ______________________________

Jeffrey J. Tinley
Federal Bar No.: ct00765
Email: jtinley@tnrdlaw.com
TINLEY, RENEHAN & DOST, LLP
60 North Main Street, 2nd Fl.
Waterbury, CT 06702
Telephone: (203) 596-9030
Facsimile: (203) 596-9036

Jon B. Fougner, *Subject to Pro Hac Vice*
Email: Jon@FougnerLaw.com
600 California Street, 11th Fl.
San Francisco, CA 94108
Telephone: (415) 577-5829
Facsimile: (206) 338-0783

Edward A. Broderick, *Subject to Pro Hac Vice*
Email: ted@broderick-law.com
Anthony I. Paronich, *Subject to Pro Hac Vice*
Email: anthony@broderick-law.com
BRODERICK & PARONICH, P.C.
99 High Street, Suite 304
Boston, Massachusetts 02110
Telephone: (617) 738-7080
Facsimile: (617) 830-0327

Matthew P. McCue, *Subject to Pro Hac Vice*
E-mail: mmccue@massattorneys.net
THE LAW OFFICE OF MATTHEW P. McCUE
1 South Avenue, Suite 3
Natick, Massachusetts 01760
Telephone: (508) 655-1415
Facsimile: (508) 319-3077

*Attorneys for Plaintiff and the Proposed Classes*